# IN THE SUPREME COURT, STATE OF WYOMING

## 2022 WY 51

**APRIL TERM, A.D. 2022**

**April 20, 2022**

JOSHUA DAVID LEVENSON,

Appellant
(Defendant),

v.

S-21-0176

THE STATE OF WYOMING,

Appellee
(Plaintiff).

*Appeal from the District Court of Laramie County*
*The Honorable Catherine R. Rogers, Judge*

*Representing Appellant:*
Devon Petersen of Fleener Petersen, LLC, Laramie, Wyoming.

*Representing Appellee:*
Bridget L. Hill, Wyoming Attorney General; Jenny L. Craig, Deputy Attorney General; Joshua C. Eames, Senior Assistant Attorney General; Timothy P. Zintak, Senior Assistant Attorney General. Argument by Mr. Zintak.

*Before FOX, C.J., and KAUTZ, BOOMGAARDEN, GRAY, and FENN, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third.  Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**FENN, Justice.**

[¶1]   Joshua Levenson entered a conditional guilty plea to possession of marijuana.  He reserved his right to challenge the denial of his motion to suppress the evidence obtained from the search of a vehicle in which he was the passenger following a traffic stop. Mr. Levenson challenges the reasonableness of the traffic stop under Article 1, Section 4 of the Wyoming Constitution and the Fourth Amendment to the United States Constitution.  He argues the stop was unreasonable under the totality of the circumstances, and thus unconstitutional.  We agree and reverse.

## ISSUES

[¶2]   Mr. Levenson presents three issues on appeal.  We rephrase and consolidate the issues as follows:

> 1. Did the district court err when it denied Mr. Levenson's motion to suppress?
>
> 2. Does Article 1, § 4 of the Wyoming Constitution provide greater protection from a pretextual stop requiring us to overrule our decision in *Fertig v. State*, 2006 WY 148, 146 P.3d 492 (Wyo. 2006)?

## FACTS

[¶3]   On August 28, 2018, Trooper Shane Carraher with the Wyoming Highway Patrol was parked on the median at a paved crossover near mile post 357 on Interstate 80 while patrolling traffic.  At approximately 8:40 p.m., Trooper Carraher observed a black Nissan Rogue traveling eastbound with several semi-trucks.  After the Nissan Rogue passed Trooper Carraher, he decided to follow it.  Most of the events were captured on Trooper Carraher's dash camera.

[¶4]   While initially not having observed any traffic violation, Trooper Carraher decided to catch up to the Nissan Rogue.  To do so, he drove in both the left and right lanes of traffic at speeds exceeding 100 miles per hour, reaching approximately 111 miles per hour at one point.  The posted speed limit for that area was 75 miles per hour.  When the Nissan Rogue came into view on the footage from his dashcam, the Trooper was traveling at 106 miles per hour in the left lane.  At the rate of speed he was travelling, it took approximately one minute and seven seconds to catch up to the Nissan Rogue.

[¶5]   When Trooper Carraher reached the Nissan Rogue, he was in the left lane and the Nissan Rogue was in the right lane, both travelling eastbound.  Trooper Carraher positioned his patrol car slightly behind the Nissan Rogue's rear bumper.  To maintain his position,

1

he applied his brakes multiple times and slowed to well below the speed limit, reaching a minimum speed of 54 miles per hour. The Nissan Rogue was in the right eastbound lane, between two semi-trucks, one in front and one in the rear. Trooper Carraher positioned his patrol car such that it would have been unsafe for the Nissan Rogue to move into the left lane. Nevertheless, the driver of the Nissan Rogue could have safely created more distance between the Nissan Rogue and the semi-truck in front by applying her brakes.

[¶6]    At this point, Trooper Carraher got close enough to the Nissan Rogue to get an accurate reading on how closely the driver was following the semi-truck. Using a stopwatch, he calculated the amount of time between the Nissan Rogue and the semi-truck in front of it. He narrated the time to his dash camera. Trooper Carraher calculated the Nissan Rogue to be traveling approximately 1.2 seconds behind the semi-truck. Additionally, he observed the driver of the Nissan Rogue did not initially brake when the semi-truck braked and prepared to take the southbound exit ramp onto Interstate 25. The Trooper observed and narrated to the dash camera that the Nissan Rogue was "getting closer to the semi." He subsequently stopped the driver of the Nissan Rogue for following the semi-truck too closely.

[¶7]    Trooper Carraher approached the Nissan Rogue on the passenger side and contacted the driver, Angeliah Busch, and the passenger, who was later identified as Joshua Levenson. The Trooper informed Ms. Busch and Mr. Levenson the reason for the stop and requested a driver's license, registration, and proof of insurance. He was handed Ms. Busch's driver's license, insurance, and the rental agreement.

[¶8]    Trooper Carraher asked Ms. Busch to accompany him to his patrol car so he could issue her a warning for following too closely. Ms. Busch exited and stood near the front of the patrol car while Trooper Carraher questioned Mr. Levenson. Mr. Levenson informed the Trooper he lost his identification card or driver's license in Reno, Nevada. He further offered unsolicited information about their travel plans.

[¶9]    Once in the patrol car, Trooper Carraher asked Ms. Busch about the parties' travel plans. Ms. Busch provided travel plans that were inconsistent with those provided by Mr. Levenson. Additionally, Trooper Carraher learned the rental agreement showed the Nissan Rogue was due back in the town in which it had been rented, Santa Rosa, California, the previous day on August 27, 2018. Trooper Carraher was concerned Ms. Busch and Mr. Levenson had an overdue rental vehicle and were traveling in the opposite direction from where it was supposed to be returned. While Ms. Busch and Mr. Levenson informed him they had extended their rental agreement, Ms. Busch was unable to verify she obtained any extension or that she was still authorized to have possession of the Nissan Rogue.

[¶10] Trooper Carraher suspected Ms. Busch and Mr. Levenson might be engaged in criminal activity, and he read Ms. Busch her Miranda rights. He further sought Ms. Busch's consent to search the Nissan Rogue, which she denied. At this point, Trooper

2

Carraher requested a drug-detection canine from the Cheyenne Police Department be dispatched to his location.

[¶11] Officer Patrick Richard Johnson with the Cheyenne Police Department arrived on scene and deployed his K-9, Pavel. Pavel positively alerted to the presence of controlled substances on the rear passenger side. Trooper Carraher then searched the Nissan Rogue and found approximately forty-two pounds of marijuana. He read Mr. Levenson his Miranda rights and arrested Mr. Levenson and Ms. Busch. Mr. Levenson was charged with two counts: felony intent to deliver a controlled substance in violation of Wyo. Stat. Ann. § 35-7-1031(a)(ii) (Count I); and felony possession of a controlled substance in violation of Wyo. Stat. Ann. § 35-7-1031(c)(iii) (Count II).

[¶12] On January 11, 2019, Mr. Levenson moved to suppress the evidence found in the Nissan Rogue. He argued that the initial traffic stop was unreasonable, and that the Trooper's own driving conduct created a safety hazard that violated Article 1, § 4 of the Wyoming Constitution and the Fourth Amendment to the United States Constitution. He further argued the initial stop was pretextual and thus prohibited by the Wyoming Constitution.[1]

[¶13] The district court held an evidentiary hearing on May 15, 2019. Trooper Carraher, Officer Johnson and Mr. Levenson testified at the hearing. During cross-examination, Trooper Carraher testified:

> Q. But you were parked in the median, correct?
>
> A. I was parked at a paved crossover prior to, yes.
>
> Q. Okay. And that was about mile post 358; is that right?
>
> A. 357, about 57 and a half.
>
> * * *
>
> Q. Okay. And when you first saw the Nissan Rogue, it was
> not following too closely; is that correct?

---

[1] Mr. Levenson's counsel originally argued the Trooper lacked reasonable suspicion that Mr. Levenson was involved in criminal activity. He later supplemented his motion on May 3, 2019, when he argued the initial stop violated the Wyoming and United States Constitutions, the Trooper impermissibly extended the scope of the stop, the K-9 failed to properly alert, and the Wyoming Constitution prohibits pretextual stops. Following the evidentiary hearing, Mr. Levenson's counsel abandoned several of his arguments and presented only two issues for the district court's review: (1) whether the initial stop was reasonable; and (2) whether the initial stop was pretextual and thus prohibited by the Wyoming Constitution.

A. Correct.

Q. It was in the left lane?

A. I don't recall. I just remember a group of vehicles, probably the Nissan Rogue and several semis.

Q. Okay. And I believe in the previous hearing for the codefendant in this case at a suppression hearing, you testified that when you first saw the Nissan Rogue you didn't see anything suspicious; is that correct?

A. Yeah, it was dark. I mean, I just see the vehicle in front of me. That was it.

Q. Okay. You didn't see speeding, correct?

A. Correct. I would not be able to -- I don't have a light on in my car so there was no way in that position I would be able to read that speed.

Q. Okay. And you didn't visually estimate the speeding?

A. No.

Q. You didn't see them following too closely, correct?

A. Correct.

Q. You didn't see any crack in the windshield?

A. Correct.

Q. Failure to maintain a single line [sic] of travel?

A. Correct.

Q. Any other traffic violation, correct?

A. No violation.

Q. But as soon as they passed you, you pull out of the median and begin to catch up to this vehicle; is that correct?

4

A. Correct.

Q. And you said that you ultimately pulled him [sic] over at milepost 360; is that correct?

A. Correct. The violation was about 358, 359. I waited to pull him [sic] over because it curves and there's entrance ramps and onramps.

Q. Right. And so at least, let's say, a mile that you're catching up to them, correct?

A. Yes. And so when they went passed me, I was in the median, I waited and then I caught up to them. I wasn't actively, like, following them for a mile and a half, I was catching up to them.

Q. Right. And you were catching up to them just by not having seen any traffic violations, correct?

A. Correct.

Q. In fact, you went over the speed limit to catch up to them.

Do you remember that?

A. Yeah.

Q. And in fact, you got up to 85 miles per hour.

Do you recall that?

A. I got much faster than that, yeah.

Q. Much faster than that. How fast do you think you were going?

A. I was going 100.

Q. Okay. Despite not seeing any traffic violation?

A. Correct.

5

[¶14]  The district court admitted the video of the entire stop and allowed the parties to submit additional briefing.  After reviewing the briefs, the district court held the initial stop was justified.  Based on Trooper Carraher's testimony that the distance between the Nissan Rogue and semi-truck was 1.2 seconds, the district court found he had personally observed a traffic violation which provided the probable cause[2] necessary for the traffic stop.  The district court declined to consider the Trooper's conduct, noting an officer's subjective intent is irrelevant.  The court then declined to find pretextual stops violate the Wyoming Constitution, citing our holding in *Fertig v. State*, 2006 WY 148, 146 P.3d 492 (Wyo. 2006).  Accordingly, it found the initial stop was justified and did not violate the Wyoming Constitution or the Fourth Amendment.

[¶15]  Mr. Levenson subsequently entered a conditional guilty plea to Count II, possession of a controlled substance, and reserved his right to appeal the issues raised in his motion to suppress.  The State dismissed Count I in exchange for Mr. Levenson's guilty plea to Count II.  The district court sentenced Mr. Levenson to twelve (12) to fifteen (15) months in prison but released him on bond pending resolution of his appeal.  He timely appealed.

## STANDARD OF REVIEW

[¶16]  In reviewing the district court's denial of Mr. Levenson's motion to suppress, we view "the evidence in the light most favorable to the district court's determination and defer [] to the district court's factual findings unless they are clearly erroneous." *Simmons v. State*, 2020 WY 132, ¶ 10, 473 P.3d 1259, 1261 (Wyo. 2020) (alteration in the original) (quoting *Robinson v. State*, 2019 WY 125, ¶ 20, 454 P.3d 149, 156 (Wyo. 2019)).  "We view the evidence in the light most favorable to the district court's decision because the court conducted the hearing and had the opportunity to 'assess the witnesses' credibility, weigh the evidence and make the necessary inferences, deductions and conclusions." *Dixon v. State*, 2019 WY 37, ¶ 17, 438 P.3d 216, 226 (Wyo. 2019) (quoting *Kunselman v. State*, 2008 WY 85, ¶ 9, 188 P.3d 567, 569 (Wyo. 2008)).  "On those issues where the district court has not made specific findings of fact, this Court will uphold the general ruling of the court below if supported by any reasonable view of the evidence." *Elmore v. State*, 2021 WY 41, ¶ 8, 482 P.3d 358, 361 (Wyo. 2021) (quoting *Pryce v. State*, 2020 WY 151, ¶ 16, 477 P.3d 90, 94–95 (Wyo. 2020)).  The ultimate question of whether the search or seizure violated a constitutional right is a question of law that we review de novo. *Elmore*, ¶ 8, 482 P.3d at 361; *Fertig*, ¶ 8, 146 P.3d at 495; *see also O'Boyle v. State*, 2005 WY 83, ¶ 22, 117 P.3d 401, 408 (Wyo. 2005) (reviewing de novo whether a traffic stop violated Article 1, § 4 of the Wyoming Constitution).

---

[2] *See infra* note 5.

**DISCUSSION**

[¶17]  Mr. Levenson challenges the district court's denial of his motion to suppress under Article 1, § 4 of the Wyoming Constitution and the Fourth Amendment to the United States Constitution.  His sole claim is that the initial traffic stop was not justified.

### I.      *Wyoming Constitutional Analysis*

[¶18]  When a party raises a state constitutional claim and provides proper argument on appeal and in the trial court below, the state constitutional analysis takes primacy—that is, the claim is first analyzed under the Wyoming Constitution. *O'Boyle*, ¶ 22, 117 P.3d at 408 (citing *Vasquez v. State*, 990 P.2d 476, 485 (Wyo. 1999)).  Article 1, § 4 of the Wyoming Constitution protects "against unreasonable searches and seizures" and reinforces the right to be secure in one's person, possessions, and property.  Mr. Levenson first asks us to hold that Article 1, § 4 provides greater protection than the federal constitution when dealing with pretextual stops.  As we previously recognized, "[o]ur state constitution provides protection of individual rights separate and independent from the protection afforded by the U.S. Constitution." *O'Boyle*, ¶ 23, 117 P.3d at 408.  Additionally, although our constitution is similarly worded, "we have held that Article 1, Section 4 of the Wyoming Constitution provides greater protections than the Fourth Amendment in certain circumstances." *Gibson v. State*, 2019 WY 40, ¶ 12, 438 P.3d 1256, 1259 (Wyo. 2019) (citing *O'Boyle*, ¶ 23, 117 P.3d at 408).  Nevertheless, in the context of the facts of this case, the result we reach is the same under Article 1, § 4 and the Fourth Amendment.  We therefore do not consider whether Article 1, § 4 provides greater protection.[3]

[¶19]  In Wyoming for the initial traffic stop[4] to be constitutional, it must be reasonable under all the circumstances. *Klomliam*, ¶ 17, 315 P.3d at 669; *O'Boyle*, ¶ 29, 117 P.3d at 409–10.  Whether or not a traffic stop is reasonable is a question of law to be decided from

---

[3] We recognize that the standard governing our analysis under Article 1, § 4 is whether the traffic stop is "reasonable under all the circumstances." *O'Boyle*, ¶¶ 30–31, 117 P.3d at 410; *Klomliam v. State*, 2014 WY 1, ¶ 17, 315 P.3d 665, 669 (Wyo. 2014).  The standard applicable to the constitutionality of a traffic stop under the Fourth Amendment "is whether the scope of the stop was reasonable under the totality of the circumstances." *O'Boyle*, ¶ 49, 117 P.3d at 415; *Robinson*, ¶ 22, 454 P.3d at 156.  Given our decision, we find it unnecessary to address whether there is any distinction between the two standards.  However, we note we have observed "that in assessing the reasonableness of a traffic stop and detention, there is not a significant difference between our federal and state analysis, given that under either analysis we are considering the reasonableness of the government intrusion in light of all the circumstances." *Klomliam*, ¶ 17 n.1, 315 P.3d at 669 n.1; *see also Pryce*, ¶ 26 n.1, 477 P.3d at 96 n.1 (noting a Wyoming Constitutional analysis applies soundly to a Fourth Amendment analysis).  We therefore continue to employ the same considerations under our Fourth Amendment analysis to a state constitutional analysis.

[4] A traffic stop is an investigatory detention and amounts to a seizure, which must be conducted in accordance with Article 1, § 4 of the Wyoming Constitution and the Fourth Amendment. *Elmore*, ¶¶ 9-10, 482 P.3d at 361; *Klomliam*, ¶ 17, 315 P.3d at 669.

7

all the circumstances. *Klomliam*, ¶ 17, 315 P.3d at 669; *Dods v. State*, 2010 WY 133, ¶¶ 5, 16, 240 P.3d 1208, 1209-12 (Wyo. 2010). We objectively analyze the surrounding facts and circumstances to determine whether the officer was justified in making the stop. *Dods*, ¶ 16, 240 P.3d at 1212 (citing *United States v. Ozbirn*, 189 F.3d 1194, 1198 (10th Cir. 1999); *O'Boyle*, ¶ 29, 117 P.3d at 410. When examining the justification for a traffic stop, an officer's subjective intent does not invalidate an otherwise lawful traffic stop. *Pier v. State*, 2019 WY 3, ¶ 18, 432 P.3d 890, 896 (Wyo. 2019) (quoting *Fertig*, ¶ 14, 146 P.3d at 496). Our decision in this case does not alter that principle. Instead, we simply make clear that an officer's conduct, no matter his subjective intent, is one of the surrounding facts and circumstances that should be considered when analyzing whether an initial traffic stop is reasonable under all the circumstances.

[¶20] Wyoming Statute § 31-5-210(a) (LexisNexis 2021) specifies "[t]he driver of a vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway." In *Robinson*, we held that a law enforcement officer can develop "a particularized and objective basis for suspecting [a vehicle of] following [a] semi-truck too closely by using the two-second rule to measure the distance between the two vehicles multiple times." ¶ 30, 454 P.3d at 158. In *Fertig*, we reiterated that efforts to enforce traffic laws are objectively reasonable and "[v]iolations of the traffic code provide an objective standard by which to judge the reasonableness of a traffic stop seizure because an observed violation provides probable cause for a traffic stop seizure."[5] ¶ 27, 146 P.3d at 501 (citing *Whren v. United States*, 517 U.S. 806, 818–819, 116 S. Ct. 1769, 1776–77, 135 L. Ed. 2 89 (1996); *Damato v. State*, 2003 WY 13, ¶ 12, 64 P.3d 700, 706 (Wyo. 2003)). Relying on these principles of law, the district court found the initial stop was justified because "Trooper Carraher had probable cause to initiate the traffic stop" based on his personal observation the Nissan Rogue was traveling 1.2 seconds behind the semi-truck in front of it.

---

[5] In *Allgier v. State*, we clarified that to justify a traffic stop under the Fourth Amendment, an officer needs reasonable suspicion—that is, a particularized and objective basis to initiate a traffic stop. 2015 WY 137, ¶ 14, 358 P.3d 1271, 1276 (Wyo. 2015), *overruling Tiernan v. State, Dep't of Transp.*, 2011 WY 143, ¶ 12, 262 P.3d 561, 565 (Wyo. 2011) (citing *Heien v. North Carolina*, 574 U.S. 54, 60, 135 S.Ct. 530, 536, 190 L.Ed.2d 475 (2014). In *Phelps v. State*, we held "[t]he decision to stop an automobile is justified under Article 1, § 4 when the officer has probable cause to believe a traffic violation has occurred *or* when the officer has a reasonable suspicion that the particular motorist is engaged in criminal activity." 2012 WY 87, ¶ 17, 278 P.3d 1148, 1153 (Wyo. 2012) (emphasis in the original) (citing *Fertig*, ¶ 28, 146 P.3d at 501). Our holding in *Allgier* was limited to a Fourth Amendment analysis. ¶ 12, 358 P.3d at 1275. Neither party has raised whether we need to revisit our decision in *Phelps*. Since the issue has not been raised and given our decision under the facts of this case, we decline to address whether an officer is required to have probable cause that a traffic violation occurred under Article 1, § 4, or whether there is any distinction between the standard to justify a traffic stop under Article 1, § 4 and the Fourth Amendment.

[¶21] Mr. Levenson challenges the district court's decision and argues the court was required to look at all the circumstances surrounding the stop, including the officer's own conduct. He asks us to find that when an officer's conduct creates the circumstances that lead to a traffic violation, the seizure is unreasonable and violates Article 1, § 4 of the Wyoming Constitution. The State recognizes an officer's actions may justify suppression. However, it contends that under the facts of this case, the initial stop was justified because there was an objective basis—the two-second rule—to believe a traffic violation had occurred.

[¶22] Here, the district court found:

> While monitoring traffic, Trooper Carraher observed a Nissan Rogue ("the vehicle") traveling eastbound. When he first observed the vehicle, nothing appeared suspicious nor had the driver committed any traffic offenses. However, Trooper Carraher decided to follow the vehicle. He pulled out of the median and caught up with the vehicle, reaching approximately one hundred and eleven (111) miles per hour.
>
> By the time Trooper Carraher caught up with the vehicle, the vehicle was in the right-hand lane of travel and positioned between tractor trailers. While traveling in the left-hand lane, Trooper Carraher reduced his speed, falling slightly behind the vehicle. . . .

While the district court found the Trooper essentially followed the Nissan Rogue at a high rate of speed without ever observing a traffic violation, it did not consider this conduct in its analysis of whether the stop was reasonable under all the circumstances. We find the district court erred by failing to look at all the circumstances surrounding the stop.

[¶23] As stated, a law enforcement official's personal observation of a vehicle following another too closely provides probable cause to initiate a traffic stop. *Tiernan v. State, Dep't of Transp.*, 2011 WY 143, ¶ 12, 262 P.3d 561, 565 (Wyo. 2011), *overruled on other grounds by Allgier v. State*, 2015 WY 137, ¶ 14, 358 P.3d 1271, 1276 (Wyo. 2015). While we have approved the use of the two-second rule to determine if there is a traffic violation for following too closely, we must reiterate that this is not a bright-line rule that can always objectively justify a traffic stop. *Robinson*, ¶ 29, 454 P.3d at 158 (finding the two-second rule is one of several ways an officer can develop reasonable suspicion that a vehicle is following too closely); *Elmore*, ¶¶ 16–23, 482 P.3d at 363–65 (considering other traffic conditions and weather to determine if the initial stop was justified). The "reasonable and prudent" language of the statute precludes the use of an "absolute standard," and instead "requires a fact-specific inquiry." *See generally Elmore*, ¶¶ 22–23, 482 P.3d 358, 364–65

(discussing the "as nearly as practicable language" under the statute for maintaining a single lane of traffic precludes the use of absolute standards and requires a fact-specific inquiry) (citing *Dods*, ¶ 18, 240 P.3d at 1212; *Tiernan*, ¶ 16, 262 P.3d at 566; *Espinoza v. State ex rel. Wyoming Dep't of Transp.*, 2012 WY 101, ¶ 9, 280 P.3d 1226, 1230 (Wyo. 2012), *overruled on other grounds by Allgier*, ¶ 14, 358 P.3d at 1276). Indeed, these type of statutes "highlight[] the need to analyze objectively *all the surrounding facts and circumstances* to determine" whether there is a justification for the stop. *Elmore*, ¶ 23, 482 P.3d at 364 (emphasis in the original) (citation omitted). We must consider the "whole picture" by evaluating all the circumstances and employing common sense and ordinary human experience, with deference being accorded to a law enforcement officer's ability to distinguish between innocent and suspicious actions. *Klomliam*, ¶ 17, 315 P.3d at 669; *Leyva v. State*, 2009 WY 149, ¶ 12, 220 P.3d 791, 794 (Wyo. 2009).

[¶24] In considering the whole picture, we look at the officer's conduct to determine whether the initial stop was reasonable under all the circumstances. In *Fertig*, we held the appropriate analytical framework to evaluate the reasonableness of a traffic stop under Article 1, § 4 is the two-pronged test articulated in *Terry v. Ohio*, 392 U.S. 1, 19-20, 88 S. Ct. 1868, 1879, 20 L. Ed. 2d 889 (1968): "1) was the initial stop justified; and 2) were the officer's actions during the detention reasonably related in scope to the circumstances that justified the interference in the first instance."[6] ¶ 19, 146 P.3d at 498 (citing *O'Boyle*, ¶ 46, 117 P.3d at 414). Under both parts of the test, a court must "examine the conduct of [the officer] to determine whether his search and seizure . . . were reasonable, both at their inception and as conducted." *Terry*, 392 U.S. at 27–28, 88 S. Ct. at 1883; *see also Yoeuth v. State*, 2009 WY 61, ¶ 17, 206 P.3d 1278, 1283 (Wyo. 2009) ("At each stage, we must determine whether, under all of the circumstances, [the Trooper's] actions were reasonable and in compliance with our state and federal constitutional prohibitions against unreasonable searches and seizures."). The officer's conduct is tested against the general proscription against unreasonable searches and seizures found in Article 1, § 4. *See generally Yoeuth*, ¶ 17, 206 P.3d at 1283; *Terry*, 392 U.S. at 20, 88 S. Ct. at 1879 (finding an officer's conduct must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures); *see also Sibron v. New York*, 392 U.S. 40, 62, 88 S. Ct. 1889, 1902, 20 L. Ed. 2d 917 (1968) ("We have held today in *Terry v. Ohio*, *ante*, p. 1, that police conduct . . . must be judged under the Reasonable Search and Seizure Clause of the Fourth Amendment.").

---

[6] "In *O'Boyle*, we determined the principles for assessing the reasonableness of a traffic stop under the Fourth Amendment were not significantly different than those applicable separately under the Wyoming Constitution." *Fertig*, ¶ 19, 146 P.3d at 498 (citing *O'Boyle*, ¶ 50, 117 P.3d at 415). We recognized this statement was followed by a discussion of the two-pronged inquiry adopted in *Terry* to test the reasonableness of investigative detentions. *Id.* (citing *O'Boyle*, ¶ 46, 117 P.3d at 414; *Campbell v. State*, 2004 WY 106, ¶ 11, 97 P.3d 781, 784 (Wyo. 2004)). Consequently, we recognized that "[i]n *O'Boyle* we tacitly endorsed the two-pronged *Terry* inquiry as providing an appropriate analytical framework for our reasonableness inquiry under Article 1, Section 4" of the Wyoming Constitution. *Id.*

No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

\* \* \*

In order to assess the reasonableness of [the officer's] conduct as a general proposition . . . [and justify] the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The scheme [against unreasonable searches and seizures] becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate? Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction. And simple good faith on the part of the arresting officer is not enough. If subjective good faith alone were the test, the protections [against unreasonable search and seizures] would evaporate, and the people would be secure in their persons, houses, papers, and effects, only in the discretion of the police.

*Terry*, 392 U.S. at 9, 20-22, 88 S. Ct. at 1873, 1879-1880 (internal citations and quotations omitted).

[¶25] When examining whether a traffic stop was justified at its inception under the first part of the analysis, we not only examine the traffic violation, but we also examine an officer's conduct using an objective standard which considers all the surrounding circumstances including the officer's own driving behavior. *Simmons*, ¶ 12, 473 P.3d at 1262 (quoting *Robinson*, ¶ 22, 454 P.3d at 156; *Martindale v. State*, 2001 WY 52, ¶ 11, 24

P.3d 1138, 1141 (Wyo. 2001), 1141. While the test is objective, we still consider the trooper's training, experience, and expertise without regard to his subjective intent. *Simmons*, ¶ 12, 473 P.3d at 1262; *Pier*, ¶ 18, 432 P.3d at 896.

[¶26]  The State and Mr. Levenson each proposed a different standard for evaluating an officer's conduct. However, we decline to adopt any new standard with respect to examining an officer's conduct.  Instead, we reiterate our holding in *O'Boyle* that "a narrower standard, one maintaining the requirement that a search [or seizure] be reasonable under all of the circumstances, [is] more consistent with the historical intent of our search and seizure provision." *O'Boyle*, ¶ 30, 117 P.3d at 410.

[¶27]  Using our narrow standard, we find an officer's own conduct may negate the objective justification necessary for an initial traffic stop and cause a traffic stop to be unreasonable when all the circumstances are considered.  There is no bright-line rule, and the officer's conduct is only one of the circumstances we must consider when examining whether the initial stop was reasonable. *Yoeuth*, ¶ 17, 206 P.3d at 1283; *O'Boyle*, ¶¶ 29-31, 117 P.3d at 409–10.  We find support for this approach from our decision in *O'Boyle*:

> We previously have expressed disapproval of the use of traffic violations as a pretext to conduct narcotics investigations. *Damato v. State*, 2003 WY 13, ¶ 13, 64 P.3d 700, [706] (Wyo. 2003). In *Damato*, we joined in another state court's expression of concern about sanctioning conduct "where a police officer can trail a targeted vehicle with a driver merely suspected of criminal activity, wait for the driver to exceed the speed limit by one mile per hour, arrest the driver for speeding, and conduct a full-blown inventory search of the vehicle with impunity."[1] *Id.*, (citing *Arkansas v. Sullivan*, 532 U.S. 769, 771–772, 121 S. Ct. 1876, 1878, 149 L. Ed. 2d 994 (2001)). Our location along a nationally recognized drug trafficking corridor likely results in a disproportionately large percentage of Wyoming's comparatively small population being subjected to what have become routine requests to relinquish their privacy rights by detention, invasive questioning and searches—all without reasonable suspicion of criminal activity other than the offense giving rise to the stop. While we acknowledge the importance of drug interdiction, we are deeply concerned by the resulting intrusion upon the privacy rights of Wyoming citizens. This concern, considered together with Wyoming's traditional interpretation of article 1, § 4 as requiring reasonableness under all the circumstances, provides further support for our conclusion that the detention in this case

> violated the Wyoming Constitution.

*O'Boyle*, ¶ 34, 117 P.3d at 411–12.

[¶28]   Turning to the circumstances of this case, after carefully reviewing the dash camera footage, we find the traffic stop was unreasonable under all the circumstances.  As Trooper Carraher testified, he was parked in the median and noticed the Nissan Rogue and several semi-trucks pass him.   Without personally observing any traffic violation, Trooper Carraher decided to follow the Nissan Rogue.  As the video depicts, and Trooper Carraher readily admitted, he reached a speed of 111 miles per hour to catch up to the Nissan Rogue. Arguably, Trooper Carraher violated the law by speeding to catch up to the Nissan Rogue without ever witnessing a traffic violation.[7]

[¶29]   Observing Trooper Carraher's rapid approach, Ms. Busch moved into the right lane between two semi-trucks.  Trooper Carraher then slowed down significantly and positioned himself in the left lane behind the Nissan Rogue so he could travel behind the vehicle at a similar rate of speed.  The Trooper's conduct congested traffic and required the Nissan Rogue to remain in the right lane between the two semi-trucks, all of which were approaching a busy interchange with the lead semi-truck slowing down to exit onto Southbound I-25.  Accordingly, under all the circumstances of this case, we find the Trooper's objective justification for a traffic violation was negated, and the initial traffic stop was unreasonable under Article 1, § 4 of the Wyoming Constitution.

## II.    *Federal Constitutional Analysis*

[¶30]   In the circumstances of this case, we do not perceive any difference between the independent protection provided to Mr. Levenson under the Wyoming Constitution and that provided by the Fourth Amendment. *See generally O'Boyle*, ¶ 45, 117 P.3d at 414 (finding no difference between the protection provided for a particular traffic stop under Wyoming and federal law); *Yoeuth*, ¶ 24, 206 P.3d at 1284 (finding no appreciable difference between the federal and Wyoming standards for a following too closely stop). However, because Mr. Levenson relies on the Fourth Amendment as well as Article 1, § 4, we proceed with a Fourth Amendment analysis.

[¶31]   Similar to the Wyoming Constitution, the Fourth Amendment to the United States Constitution protects against "unreasonable searches and seizures." U.S. Const. amend. IV. Under the Fourth Amendment, there are "three tiers of interaction between law enforcement and citizens: consensual encounters, investigatory detentions and arrests." *Simmons*, ¶ 11, 473 P.3d at 1262 (citation omitted).  Mr. Levenson's interaction with law

---

[7] The driver of an authorized emergency vehicle is only authorized to exceed the maximum speed limits "when responding to an emergency call or when in pursuit of an actual or suspected violator of the law." Wyo. Stat. Ann. § 31-5-106(a)(iii) (LexisNexis 2021).

enforcement began as a traffic stop which is an investigatory detention that must comply with the Fourth Amendment. *See Elmore*, ¶ 10, 482 P.3d at 361. "We evaluate the reasonableness of an investigatory [detention] under the Fourth Amendment by using the two-part inquiry from *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S. Ct. 1868, 1879, 20 L. Ed. 2d 889 (1968): (1) whether the initial stop was justified; and (2) whether the officer's actions during the detention were reasonably related in scope to the circumstances that justified the interference in the first instance." *Pryce*, ¶ 18, 477 P.3d at 95 (internal quotation and citation omitted).

[¶32]   To justify an initial traffic stop, a "trooper must have reasonable suspicion—that is, a particularized and objective basis to suspect the motorist is violating the law." *Elmore*, ¶ 10, 482 P.3d at 361 (quoting *Simmons*, ¶ 12, 473 P.3d at 1262). When initiating a traffic stop, the conduct of the officer must be reasonable. *Terry*, 392 U.S. at 27–28, 88 S. Ct. at 1883; *see also Sibron*, 392 U.S. at 62, 88 S. Ct. at 1902. "The trooper's conduct is judged by an objective standard which takes into account the totality of the circumstances." *Elmore*, ¶ 10, 482 P.3d at 361 (quotation omitted); *Pryce*, ¶ 18, 477 P.3d at 95. "While the test is objective, the trooper's training, experience, and expertise are to be considered as part of the totality of the circumstances." *Elmore*, ¶ 10, 482 P.3d at 361 (quoting *Simmons*, ¶ 12, 473 P.3d at 1262). When determining whether the officer's conduct and the traffic stop are reasonable, "the [United States] Supreme Court has [also] rejected bright-line rules and focused instead on a fact-specific reasonableness inquiry." *O'Boyle*, ¶ 46, 117 P.3d at 414 (citing *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S. Ct. 417, 421, 136 L. Ed. 2d 347 (1996); *Barch v. State*, 2004 WY 79, ¶ 8, 92 P.3d 828, 832 (Wyo. 2004)).

[¶33]   As to the reasonableness of the stop, we reach a corresponding conclusion under the Fourth Amendment and the Wyoming Constitution. In *United States v. Esteban*, the United States District Court for the District of Utah, considered a trooper's driving conduct when reviewing a traffic stop for failing to signal for two seconds prior to changing lanes under the Fourth Amendment. 283 F. Supp. 3d 1115 (D. Utah 2017). It held:

> In the particular circumstances of this case, the court finds that Trooper Tripodi provoked the two-second traffic violation, though perhaps unintentionally. *But see Whren v. United States*, 517 U.S. 806, 813, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996) (holding the subjective motives of the officer are not at issue in Fourth Amendment analysis). The Supreme Court has held that observed traffic violations provide "the 'quantum of individualized suspicion' necessary to ensure that police discretion is sufficiently constrained" in conducting traffic stops. *Id.* at 817–18, 116 S. Ct. 1769 (quoting *Delaware v. Prouse*, 440 U.S. 648, 654–55, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979)) . . . . Though Trooper Tripodi may not have been "tailgating," he significantly increased his speed, exceeding the

14

> acknowledged speed limit while also passing the emergency vehicles on the side of the road, and came up behind Mr. Esteban's vehicle very quickly. Trooper Tripodi recognized that Mr. Esteban could reasonably have thought that a police officer, approaching quickly from behind, wanted his vehicle to move out of the way as soon as practicable.

*Esteban*, 283 F. Supp. 3d at 1129. Under the particular circumstances of that case, the court found the trooper's conduct vitiated the reasonable suspicion necessary to justify a stop under the Fourth Amendment. *Id.* at 1129-1130; *see also United States v. Ochoa*, 4 F. Supp. 2d 1007, 1012 (D. Kan. 1998) (considering the officer's conduct and finding a single lane drift caused by the officer did not amount to a traffic violation justifying an initial stop); *Cf. United States v. Worthon*, 520 F.3d 1173, 1179–81 (10th Cir. 2008) (considering the officer's conduct but finding the traffic stop was not unreasonable because the defendant conceded he committed a traffic violation and nothing in the record indicated the officer's conduct was a significant factor in causing the traffic violation).

[¶34]  Looking to the totality of the circumstances and considering the Trooper's conduct, we find similar to *Esteban*. Based on the circumstances of this case as discussed above, Trooper Carraher's conduct vitiated the reasonable suspicion necessary to justify the initial traffic stop. Our de novo review of the ultimate determination regarding the constitutionality of the initial stop in this case leads us to conclude that the initial traffic stop was unreasonable and violated the Fourth Amendment.

### III.    *We continue to adhere to our decision in Fertig v. State*

[¶35]  Mr. Levenson next asks us to overrule or revisit our decision in *Fertig v. State*, 2006 WY 148, 146 P.3d 492 (Wyo. 2006). In *Fertig*, the sole issue was "whether a pretextual traffic stop violates Article 1, Section 4 of the Wyoming State Constitution." ¶ 9, 146 P.3d at 495. As we recognized, "[a] pretextual stop occurs when the police use a legal justification to make the stop in order to search a person or place, or to interrogate a person, for an unrelated crime for which they did not have the reasonable suspicion necessary to support a stop." *Id.* (citing *United States v. Botero–Ospina*, 71 F.3d 783, 786 (10th Cir. 1995) (en banc)).

[¶36]  In *Fertig*, officers with the Wheatland Police Department were advised that the defendant was possibly involved in drug activity. Officers were asked to stop the defendant's vehicle if they observed any traffic violation so they could search for evidence of such activity. *Id.* at ¶ 4, 146 P.3d at 494. An officer observed Mr. Fertig speeding, and he was subsequently pulled over and arrested for possession of drug paraphernalia. *Id.* at ¶ 10, 146 P.3d at 495. On appeal, Mr. Fertig admitted that the officer had probable cause[8]

---

[8] *See supra* note 5.

15

to initiate a traffic stop after personally observing the speeding violation. *Id.* However, he asserted that the underlying motive of the officer to search for drugs rendered the stop unconstitutional at its inception. *Id.* Adopting the reasoning of *Whren*, we held:

> We conclude that a traffic stop initiated by a law enforcement officer after personally observing a traffic violation is supported by probable cause[9] and does not violate Article 1, Section 4 of the Wyoming Constitution, regardless of the officer's primary motivation. Our holding in this case addresses only the initial police action upon which the vehicular stop was predicated. The scope, duration, and intensity of the seizure, as well as any search made by the police subsequent to that stop, remain subject to the strictures of Article 1, Section 4, and judicial review. The nature of the traffic offense remains relevant in determining whether the search and seizure was "reasonable under all of the circumstances" as required by Article 1, Section 4.

*Id.* at ¶ 28, 146 P.3d at 501.

[¶37] Given our holding in this case, we find no reason to depart from our decision in *Fertig* and continue to adhere to the principle that "an officer's subjective intent to search for drugs does not invalidate an otherwise lawful traffic stop." *Pier*, ¶ 18, 432 P.3d at 896. We do note though that regardless of the officer's subjective intent, there must still be an otherwise lawful traffic stop that is reasonable under all the circumstances. *Id.*; *Klomliam*, ¶ 17, 315 P.3d at 669; *Yoeuth*, ¶ 20, 206 P.3d at 1283; *O'Boyle*, ¶ 29, 117 P.3d at 409–10.

## CONCLUSION

[¶38] The Wyoming Constitution requires searches and seizures be reasonable under all the circumstances. Similarly, the Fourth Amendment requires us to employ an objective standard which considers the totality of the circumstances. Both the Wyoming Constitution and Fourth Amendment reject the adoption of any bright-line rule and instead require a fact-specific reasonableness inquiry, which includes objectively analyzing the officer's conduct to determine if he was justified when he initiated the stop. We find the traffic violation for following too closely was not objectively justified and was unreasonable at its inception. Therefore, the traffic stop violated Article 1, § 4 of the Wyoming Constitution and the Fourth Amendment, and the district court erred in denying Mr. Levenson's motion to suppress. We reverse.

---

[9] *See supra* note 5.